Filed 10/30/15  In re B.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.N., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063302 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1400011) |
| v. | OPINION |
| A.N. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Jarvis, Krieger & Sullivan and Siobhan M. Bishop for Defendants and Appellants.

Gregory P. Priamos, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

Appellants S.N. (father) and A.N. (mother) appeal from a Welfare and Institutions Code[1] section 366.26 order terminating parental rights to their son, B.N. (the child). On appeal, father and mother (the parents) contend that: (1) the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)) applied; (2) the court erred in refusing to allow their daughter to testify about her relationship with the child; and (3) the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) applied. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The parents were married and decided to adopt children. They adopted their oldest daughter, A.N., from China in 2005. She was 11 months old at the time. Mother later became pregnant and gave birth to twin girls, T.N. and H.N. (the twins). Subsequently, the parents were contacted about the child, who was available for adoption from China. They received the child into their home on March 4, 2013.

The child did not have a smooth transition into the parents' home. He bonded with father. However, he had issues accepting mother and in fact seemed to be "rejecting her as [a] mother figure." He would not respond to her requests or demands and would withdraw from her. The child's behavior caused stress and frustration for mother, which led her to scream and yell at him. Mother did not know how to deal with the child's rejection. The parents discussed rescinding the adoption. Mother decided to give the child time to see if things would change.

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

On January 3, 2014, the Riverside County Department of Public Social Services (DPSS) filed a section 300 petition on behalf of the child and his sisters (the children). A.N. was nine years old at the time, the twins were three years old, and the child was three years old, as well. The petition alleged that the child came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (e) (severe physical abuse of a child under five). The petition also alleged that A.N., T.N., and H.N. (the girls) came within the provisions of section 300, subdivisions (b) and (j) (abuse of sibling). The petition included the allegation that, while in the care and custody of the parents, the child sustained multiple fractures to various parts of his body, including his left and right clavicle, upper left humerus bone, and lower left humerus bone. The parents had no explanation for the injuries. The petition alleged that the girls were at risk of similar harm.

In the detention report, the social worker reported that DPSS received a referral on December 30, 2013, regarding the child. Father brought the child to the emergency room, and the child was initially diagnosed with a fractured left arm. The fracture was highly suggestive of non-accidental trauma. Father reported that the child fell a couple days prior and had been unable to use his arm. The social worker spoke with a nurse at the hospital, who said that the police had been contacted regarding child abuse concerns. After arriving at the hospital, a police officer spoke with father, who said that he had been away from home on business for about one week. When he returned home, mother informed him that she noticed the child was reluctant to use his left arm and his elbow

seemed swollen. Mother said that a few days prior, she found the child lying on the floor, while he was playing with his sisters. She assumed he fell. She checked him for injuries, and he seemed fine. However, she became concerned when the child's elbow swelled up a few days later. They then decided to take him to the doctor.

The police officer spoke with the emergency room doctor, Victoria Shooks, who said that a skeletal survey was done and several fractures were noted. Some fractures appeared to be at least six weeks old. Dr. Shooks said there was a fracture to the upper left humerus bone, near the shoulder. It was the type almost seen exclusively in child abuse cases, since it could only be explained by a tugging or pulling motion, and a twisting action in an upward motion. There was another fracture to the lower left humerus bone, which appeared to be the most recent fracture. This fracture and the shoulder fracture were highly indicative of someone having grabbed the child with significant force. Dr. Shooks and a radiologist agreed that the fractures were particularly indicative of abuse. Dr. Mark Massi performed a child abuse and neglect exam and similarly concluded that the child's injuries were indicative of physical abuse and neglect.

On January 6, 2014, a juvenile court detained the children in foster care. The court ordered visitation twice a week.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on January 23, 2014, and recommended that the children be declared dependents of the court, and that reunification

4

services not be provided to either parent, pursuant to section 361.5, subdivision (b)(5) and (b)(6). The social worker further reported that the child and A.N. were placed with the paternal grandparents, and the twins were placed with a paternal uncle and aunt.

The social worker filed an amended petition on April 17, 2014. The amended petition deleted the allegations under section 300, subdivisions (a) and (b). At a hearing on that date, the court found that the child came within section 300, subdivision (e), and declared him a dependent of the court. It also denied reunification services to the parents as to the child, pursuant to section 361.5, subdivision (b)(5) and (b)(6), and set a section 366.26 hearing for September 2, 2014. Regarding the twins, the court found true the allegations under section 300, subdivision (j), and declared them dependents of the court. The court removed them from the parents' custody and ordered the parents to participate in reunification services. The parties reached an agreement to have A.N. returned to the parents. The court ordered her returned to the parents' custody, subject to DPSS supervision, on a family maintenance plan.

*Status Review Report*

On August 20, 2014, the social worker filed a combined report pursuant to sections 366.26, 366.3, 366.21, and 364. The social worker recommended that the parents be offered an additional six months of family maintenance services as to A.N. As to the twins, she recommended that they be returned to the parents' custody under a family maintenance plan. Regarding the child, the social worker recommended that parental rights be terminated. The social worker reported that the twins had been having

5

overnight visits with the parents, and that the family consistently visited the child once a month.  They enjoyed the visits, and the visits went well.  The social worker reported that the children appeared to have a significant bond with the parents and each other.  The social worker further reported that the child had adjusted well to his prospective adoptive home, where he had been placed since April 23, 2014.  He was described as a "happy go lucky, outgoing child."  He appeared happy to see his family at visits.  However, he did not cry with the transition back to his prospective adoptive family after the visits.

The social worker filed an addendum report on August 23, 2014, and attached a preliminary adoption assessment report.  The social worker described the prospective adoptive parents as mature and stable.  The child was attached to them, sought their attention and affection, and was easily comforted by them.  The prospective adoptive parents were also attached to him.  They were committed to raising the child in a safe, loving environment.

*Section 388 Petitions*

On August 28, 2014 and September 2, 2014, respectively, father and mother filed section 388 petitions asking the court to return the child to them and provide services.  The petitions were summarily denied.  However, at the six-month review hearing regarding T.N. and H.N., the court returned the twins to the parents' custody under a plan of family maintenance.

On November 20, 2014, the girls filed a section 388 petition, asking the court to grant them standing to participate in the section 366.26 hearing scheduled for the child.

They opposed the adoption of the child and wanted to be heard by the court. The court denied the petition, stating that there had been no showing that the request would be in the child's best interest.[2]

The social worker filed an addendum report on December 16, 2014, and stated that there had been no new developments in the case. The social worker reported that she observed the child with his prospective adoptive parents, and at visits with the parents and the girls. The social worker stated that the child called his prospective adoptive mother "mommy" and appeared to be content in her care. When he visited with the parents and the girls, he also appeared content. The social worker stated that the child appeared to interact equally well with both families. She thus continued to recommend that the child remain with the prospective adoptive parents, and that the adoption be finalized.

*Section 366.26*

The court held a contested section 366.26 hearing on January 16, 2015. Counsel for the parents had requested that A.N. be permitted to testify regarding her relationship with the child. The child's counsel objected to having A.N. testify. County counsel agreed that A.N. should not testify, arguing that the issue was not what was in A.N.'s best interest or that she wanted to have continued contact with the child. Rather, the issue was whether adoption was in the child's best interest; thus, any testimony about how A.N. felt

---

[2] The girls filed a notice of appeal from the denial, and that appeal is currently pending before this court in case No. E062627.

7

about not seeing the child was irrelevant. Counsel for A.N. argued that, because the child could not give a direct statement regarding his interests due to his young age, the court could obtain his interest indirectly through A.N. The court noted that it had read all the documents filed in the current case and made clear that it had no doubt there was a close relationship between the child and A.N., as well as the twins. Since there was evidence in the record that the children were close, and there was no evidence to the contrary, the court decided not to permit A.N. to testify.

The social worker testified at the hearing. She said the parents had visits with the child once a month. The last visit she supervised was on December 18, 2014. The visit went well. The child was happy to see the girls and the parents. He appeared to have more of an affinity for A.N. The children read with each other and played with toys, and the parents brought snacks. The social worker testified that the child appeared to be happy during the visits, but was fine when the visit ended. He said goodbye to everyone. She testified that at the end of visits in general, the child was not particularly sad.

Father also testified at the hearing regarding the visit on December 18. He said the child called him "daddy" and mother "mommy." Father said the child enjoyed the last visit, as shown by his laughter. The child played with the parents and the girls. Mother also testified that the child had pet names for his sisters. She said that when the child left his sisters at the end of visits, he was sad.

After hearing testimony and closing arguments, the court found it likely that the child was going to be adopted. The court also found that there was a sufficient basis for

terminating parental rights. The court stated that two exceptions to the termination of parental rights had been argued—the sibling relationship exception and the parental bond exception. It noted that the parents may have a bond, but it was clear that such bond did not outweigh the benefits of adoption. The court further found that the siblings had a close relationship. However, the child was clearly in a very good home, where he was free from abuse, and where he was loved and cherished. Thus, the court found that neither exception applied and that adoption was in the child's best interest. The court terminated parental rights and set adoption as the permanent plan.

## ANALYSIS

### I. The Sibling Relationship Exception Did Not Apply

The parents contend that the court erred in failing to apply the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v). They also argue that the court erred in not permitting A.N. to testify about her relationship with the child. We conclude that the sibling relationship exception did not apply here.

The sibling relationship exception applies when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) Thus,

"the sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) To show a substantial interference with a sibling relationship, the party opposing adoption "must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952 (*L. Y. L.*).) "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended." (*Ibid.*)

First, the parents argue that the court erred in not permitting A.N. to testify regarding the child's relationships with his sisters. They claim that her testimony regarding what the children did together, how close they were, and how the child acted when he saw A.N. and/or had to leave her, was relevant to determining whether the detriment from ending the sibling relationship outweighed the benefit of adoption. We agree with the trial court's decision not to have A.N. testify. The social worker, father, and mother all testified as to what the child and the girls did together at visits, how they interacted, the nicknames the child called the girls, and how he reacted at the end of visits. Furthermore, the court read all of the documents filed and clearly stated it had no doubt that the child had a close relationship with A.N., as well as with the twins. Since

10

the court acknowledged that the children were close, more testimony from A.N. regarding their relationships was not necessary.

Second, the parents failed to show the existence of a significant sibling relationship. The evidence showed that all the siblings had close bonds, in general. At visits, the child was happy to see the girls, and they played games together, laughed, read, and ate together. However, the evidence did not demonstrate that the severance of their relationship would be detrimental to the child. The child was adopted by the parents and only lived with the girls for 10 months before he was removed from the home. Although the child and A.N. were placed together with the paternal grandparents when they were first removed, the child was placed with the prospective adoptive family less than three months after that. Moreover, while the child had fun at the visits with the girls, he was not sad when he separated from them. To the contrary, the social worker testified that the child was fine when the visits ended. She testified that he said goodbye to everyone and was not particularly sad. Thus, there was no evidence that the child would suffer detriment if the relationships ended. (*L. Y. L.*, *supra*, 101 Cal.App.4th at p. 952.) As such, the parents have not sustained the burden of proof that termination of parental rights would substantially interfere with the child's sibling relationships. (See *ibid.*)

"Moreover, even if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (See *L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952-953.) If parental rights were

11

terminated here, the child would gain a permanent home through adoption. If parental rights were not terminated, he would lose the permanent home his prospective adoptive parents were ready to provide for him. Valuing the child's continuing relationships with his siblings over adoption would deprive him of the ability to belong to a family that loved him and was able to provide a stable home for him. We conclude that the benefits of adoption outweighed the benefits of the continuing the child's sibling relationships.

In sum, the court properly determined that the sibling relationship exception to the termination of parental rights did not apply here.

## II. The Beneficial Parental Relationship Exception Did Not Apply

The parents contend that the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). We disagree.

At a section 366.26 hearing, the court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the permanent plan preferred by the Legislature. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one of the exceptions set forth in section 366.26, subdivision (c)(1)(B). One such exception is the beneficial parental relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). (See *In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1206.) This exception applies when the parents "have maintained regular visitation and

12

contact with the child and the child would benefit from continuing the relationship."

(§ 366.26, subd. (c)(1)(B)(i).) The phrase "benefit from continuing the relationship" refers to a parent/child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H*).) It is the parent's burden to show that the beneficial parental relationship exception applies. (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1345.)

The parents assert that they maintained consistent visitation with the child at every opportunity available. They state that the child called them "mommy" and "daddy." They brought his favorite food and toys to the visits, they read with him, fed him, talked with him, and played games with him. The parents further assert that they were the child's primary caretakers for nine months, prior to his removal.

The parents cite *In re Brandon C*. (1999) 71 Cal.App.4th 1530 in support of their position. However, that case is distinguishable. In that case, the Department of Children and Family Services failed to provide information to the court about the quality of the interactions between the mother and her children. Rather, the reports simply described

13

"the regularity of the visits, with no evaluation of their success." (*Id*. at p. 1538.) Thus, the only evidence before the juvenile court concerning the mother's relationship with her children was the testimonies of the mother and the paternal grandmother that there was a close bond, and that a continuation of contact would be beneficial to the children. (*Id*. at p. 1537.) The appellate court noted that the Department of Children and Family Services did not present any evidence to the contrary. (*Ibid*.) Therefore, the appellate court affirmed the juvenile court's finding that the beneficial parental relationship exception applied. (*Id*. at p. 1538.)

In contrast, here, the social worker provided information regarding the quality of the parents' relationship with the child. The social worker reported that father told her the child did not have a smooth transition into the parents' home, when they adopted him. Although the child bonded with father, he had issues accepting mother and attaching to her. Father said the child seemed to be "rejecting her as [a] mother figure." The child would often not listen or respond to her, and he would withdraw from her. Father reported that mother would vent her frustration with the child by screaming and yelling at him. The parents even discussed the possibility of rescinding the adoption, if the situation did not improve. After the child's removal, the parents consistently visited the child once a month, and the visits went well. The social worker opined that the child appeared to have a significant bond with the parents. However, although the parents' interactions with the child during visits may have been appropriate, they, at best, "amounted to little more than playdates for him with [] loving adult[s]." (*In re Bailey J.*

14

(2010) 189 Cal.App.4th 1308, 1316.) The child was described as a "happy go lucky, outgoing child." Thus, he appeared happy to see his family at visits and had fun with them. Significantly, while the child was happy with his family during visits, the social worker reported that the child was also content in the prospective adoptive mother's care, and he called her "mommy." The social worker reported that the child interacted equally well with the parents and the prospective adoptive parents. The child did not cry at the end of visits with the parents, and the social worker observed that he "transition[ed] very well between the families." Thus, although the visits may have gone well, the parents' interactions with the child do not demonstrate that their relationship with him promoted his well-being "to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

The parents further compare themselves to the father in *In re S.B.* (2008) 164 Cal.App.4th 289. In that case, the appellate court reversed the order terminating parental rights, finding that the father and his child had a strong bond, and the child would benefit from continuing the relationship. (*Id.* at p. 300.) However, *S.B.* is readily distinguishable. First, the father in *S.B.* was the child's primary caregiver for three years. (*Id.* at p. 298.) The child therefore had an emotionally significant relationship with him, and for the first year after she was removed, she continued to display a strong attachment to him. "She was unhappy when visits ended and tried to leave with [the father] when the

15

visits were over." (*Ibid.*) The record also showed that the child loved the father and wanted their relationship to continue. (*Ibid.*)

In contrast, the parents in the instant case adopted the child, and he only lived with them for 10 months before he was removed from their care. He did not develop an emotionally significant relationship with them, as evidenced by his difficult transition into their home. (See *ante*.) Moreover, the child was not sad when visits with them ended, and there was no evidence that he wanted his relationship with the parents to continue. He easily went back with his prospective adoptive parents when the visits were over.

We further note that the evidence showed that the child and his prospective adoptive parents had a strong attachment. The child was happy and well cared for, they loved him, and they wanted to provide a permanent home for him. They were committed to raising him in a safe and loving environment.

Ultimately, the parents have not proffered any evidence to support a finding that the child had a "substantial, positive emotional attachment such that [he] would be greatly harmed" if the relationship was severed. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) We conclude that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(1) did not apply here.

## DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

McKINSTER
J.

KING
J.